Filed 2/4/15  In re Josiah W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

In re JOSIAH W., a Person Coming Under the Juvenile Court Law.

SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,

Plaintiff and Respondent,

v.

DARYL R.,

Defendant and Appellant.

D066154

(Super. Ct. No. CJ1123)

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Katherine A. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Daryl R. (Father) appeals a juvenile court judgment terminating his presumed parental rights to the minor, Josiah W., and choosing adoption as the appropriate permanent plan. (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless noted.) When Josiah (now 3 years of age) was a year and a half old, respondent San Diego County Health and Human Services Agency (the Agency) responded to a police report of suspected child endangerment by offering Father voluntary services for his drug problems for three months and, later, when this dependency case was established, reunification services for six months. (§ 300, subd. (b) [risk of suffering serious physical harm or illness for lack of adequate supervision].)

Father challenges the sufficiency of the evidence to support the court's finding that no exception to adoption preference (i.e., the beneficial parent-child relationship, § 366.26, subd. (c)(1)(B)(i)) applies here. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) He also argues the court erred when it did not select an alternative permanency plan, guardianship or long term foster care. (§ 366.26, subd. (c)(1), (c)(4)(A).) We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. Jurisdiction Taken; Reunification Services; Six-Month Review Hearing

The Agency received a hotline referral on November 17, 2012 that a child was screaming at a hotel where Father and Josiah were staying. When police arrived they found 1 1/2-year-old Josiah had a one-inch bump and abrasion on his forehead. Father was observed to be under the influence of drugs, and he had two glass pipes with him for

2

consuming drugs. Father was charged with child endangerment, possession of drug paraphernalia, and being under the influence of a controlled substance.

The Agency investigated and offered Father voluntary services, in-home parenting education, outpatient substance abuse treatment and drug testing. The Agency determined that Father, the appellant, is not Josiah's biological father but he is the presumed father. (Fam. Code, § 7611, subd. (d).) Shortly after Josiah was born, his mother had left him in Father's care, since she was unable to care for him due to her use of methamphetamine and other drugs. Although her parental rights were also terminated in this proceeding, she is not a party to this appeal.

After a few months, the Agency determined that Father did not or could not comply with the voluntary case plan, and it filed a petition under section 300, subdivision (b). The Agency alleged Josiah was at risk of suffering serious physical harm or illness because Father was unable to adequately supervise, protect, or provide regular care for him as a result of substance abuse. At a hearing on March 4, 2013, the court sustained the allegations, removed Josiah from Father's custody, and ordered supervised visitation between them.

In the March 25, 2013 jurisdiction and disposition report, the social worker stated that Father was willing to receive services, such as parenting education, and he wanted to reunify with Josiah. Although Father denied he had a substance abuse problem, he was willing to attend substance abuse treatment. However, no visitation with Josiah was allowed because Father was providing positive drug tests, but Father kept in contact daily

on the telephone. Paternity testing was performed, showing no probability he was Josiah's biological father. Father requested a contested dispositional hearing.

Although Father completed an intake appointment for drug treatment on March 25, 2013, he continued to test positive for methamphetamine and marijuana. Although he had been referred for in-home parenting classes, he refused to participate. The court ordered that he would be allowed supervised visitation with Josiah at the Agency's offices, provided he was clean and sober at all times. Several supervised visits in March, April and May 2013 went well. Generally, at the end of those visits, Josiah cried, but once Father was out of sight, Josiah calmed down and fell asleep.

In April, Father agreed to go to parenting education and seemed open to new ideas. Josiah was moved between several foster homes, but in late May 2013, he was placed in the home of a nonrelative extended family member (NREFM), Bernetta G. (Ms. G.).

In May, Father declined to participate in an on-demand drug test, because he had to leave town. He claimed he was not using drugs and asked that the social worker pay attention to the positive things he was doing.

After Father decided not to request a contested dispositional hearing, the court ordered a reunification case plan and allowed Father supervised visitation with Josiah, with the Agency given the discretion to lift supervision. At a June special hearing on Ms. G.'s travel request, the social worker reported Josiah had adjusted well to her home, and she had arranged developmental services for him such as speech therapy, individual therapy, and a full developmental evaluation.

4

At a team decision making meeting held in late May, Agency representatives and Father met to discuss Josiah's placement and developmental services. Father did not seem to be fully engaged at the meeting and said he did not have time to discuss visitation. A plan was developed anyway for visitation three times per week at a park or play area. Father was allowed daily telephone contact. In late May and early June, Father missed a couple of visits, saying he was too busy. A late June visit was problematic, because Father took Josiah out of Ms. G.'s sight, talked on the telephone, and complained about the court report. Ms. G. also reported that at a July 3 visit, Father was not paying attention to Josiah, since he was talking on the telephone, when Josiah left to go up the escalator by himself. A passerby stopped him at the top until Father retrieved him.

In June and July, 2013, Father was not attending or participating in drug treatment as planned, and he had recently tested positive for methamphetamines in May, June and July. However, he did not feel he had a substance abuse problem. When Father tested positive for methamphetamine in October, he was referred to a detoxification program. He left the social worker "a very angry voice mail" stating it was the fault of the social workers that he was kicked out of his treatment programs, and he never would have tested positive if the Agency had not taken Josiah away from him. He also said all the positive drug tests were wrong.

On August 2, 2013, the Agency responded to Father's request to take Josiah out of the placement with Ms. G. and move him to a foster home. Father said he was having problems with her and his telephone calls to Josiah. No change in placement was made

5

but a telephone schedule was set up. Father continued to have three visits a week with Josiah.

Father had been sent to therapy at the "Incredible Families" program, whose therapist evaluated him as needing "to grow in terms of parenting techniques and his ability to learn more about age appropriate behavior and expectations." The therapist told him that since he was having dirty drug tests, he must be delusional or lying about his drug use. She explained to him that he had to stop using marijuana and methamphetamine and test clean all the time.

In October 2013, Father was having problems with his supervised visits, because the program would not allow him to walk Josiah to the monitor's car, and Father thought that was traumatizing him. The social worker told Father that Josiah usually stopped crying right after the visitation monitor drove off, and she did not agree that he was having serious separation problems.

The Agency social worker prepared a November 12, 2013 status review report, stating that the placement was going well, Josiah was receiving speech and individual therapy, and he was on the waiting list for Headstart. The social worker evaluated Father as not making substantial progress with his case plan. Although he was participating in supervised visits and some parenting classes, he continued to test positive for methamphetamine use, and he had been discharged from three substance abuse programs because he refused to enter a residential program.

According to the Agency's preplanning and assessment unit report, Josiah was found to be adoptable. The social worker recommended both Father's and Mother's

6

reunification services should be terminated at the upcoming hearing in January 2014, and that a selection and implementation hearing should be set.

In a December addendum report, Ms. G. reported she had a confrontation with Father about Thanksgiving dinner, which upset Josiah while he was standing in the doorway listening to them yell about it. She threatened to phone the police, and Father angrily left. Although Father was consistently visiting Josiah, Father had not been able to maintain his sobriety, denied he had a substance abuse problem, and refused to enter detoxification or a residential recovery program.

By the time of the January 7, 2014 addendum report, the social worker reported that Father had enrolled in a drug recovery center, was testing clean, and was participating in parenting class. However, she still felt he was not addressing all the issues that had brought Josiah into the dependency system.

At the January 7, 2014 contested six-month review hearing, the juvenile court found by clear and convincing evidence that Father failed to participate regularly and make substantive progress in his treatment plan, and there was no substantial probability Josiah would be returned to his physical custody within six months. Therefore, the court terminated Father's reunification services and scheduled a hearing for selection and implementation of a permanent plan for Josiah. (§ 366.26.)

B. Permanent Plan Hearing and Ruling; Visitation Logs Exhibit

In preparation for the contested section 366.26 hearing, social worker Sarah Wilson submitted an assessment report dated May 4, 2014. She stated that Ms. G. was not able to adopt Josiah and filed a supplemental petition to change his placement. In

7

mid-April, he began visiting and being transitioned to a confidential prospective adoptive home. The prospective foster and adoptive mother (the foster mother) had an approved adoptive home study and all necessary clearances. She had previously adopted a dependency child and wanted to add another child to her family. The court agreed that Josiah could be moved there by the end of April 2014.

Ms. Wilson observed five weekly visits between Josiah and Father that were facilitated by a visitation monitor, on February 10 and 24, March 10, and April 3 and 14, 2014. Father had missed two visits in March when he was in a detoxification program. Josiah enjoyed all the visits, starting them out by running up to Father and hugging him, calling him Daddy. Father brought food and toys, and they colored and read books. Father sometimes had to redirect Josiah to get his attention. The visitation logs observed there were times when Josiah whimpered or protested when it was time to leave. However, at the visits Ms. Wilson had observed thus far, she did not see Josiah show any significant distress at the end of the visits. She thought that overall, the visits between Josiah and Father were positive experiences, as it was clear Josiah loved Father and enjoyed spending time with him.

According to the May 20 addendum report, when the visitation monitor arrived at Ms. G.'s home on April 21 and 28 to take Josiah to visit with Father, Josiah kicked, screamed, and refused to go to the car. Ms. G. said she and the monitor attempted to calm Josiah down, told him he was going to visit with "Daddy," and that he would be coming back to Ms. G.'s home afterwards. However, they gave up and the monitor was

8

unable to take Josiah to the visitation center those days. By late April, Josiah had begun his visits to the foster mother.

On May 5, social worker Wilson attempted to take Josiah from the home of the foster mother to visit Father, but Josiah resisted by running back towards the house and shaking his head. After several minutes, she and the foster mother put Josiah into his car seat while he screamed, cried, and kicked. However, Ms. Wilson observed that he calmed down on the way to the visitation center and had a nice visit with Father. They played with different toys and colored with chalk, and Josiah kept asking where his foster mother was. Josiah did not have any problem separating from Father when the visit ended. Another visit on May 12 was similar, in that Josiah separated easily from Father at the end.

Father filed a motion under section 388 for return of custody or to vacate the permanency planning hearing and reinstate reunification services. Father had maintained his sobriety and believed that transitioning Josiah into the foster mother's home was causing him trauma and distress.

The Agency filed an addendum report in opposition to the section 388 petition. According to the social worker, it was very likely Josiah could be adopted if parental rights were terminated, because he was "a smart, sweet and [an] engaging 2-year old boy." The foster mother was very interested in adopting him, but if she were unable to do so, there were 51 approved San Diego County families interested in adopting a child with Josiah's characteristics. When the social worker evaluated the most appropriate permanent plan for Josiah, she stated that she had examined the strengths and quality of

9

the relationship between Father and Josiah, compared to the benefits of adoption. Based on her observations from five visits between them (and two more later), she saw there was strength in the relationship between Josiah and Father. She nevertheless concluded that Josiah usually greeted other people as well as Father with a smile and open arms, including herself, the court-appointed special advocate (CASA), and others. Josiah was a very happy and social child who was eager and excited to interact with almost everyone he encountered.

Overall, Ms. Wilson did not think the father-child relationship was significant enough to cause detriment to Josiah if Father's parental rights were terminated. She further concluded that the quality of the parent-child relationship was negatively affected by Father's continuing drug use. In her opinion, part of having a parental relationship with a young child includes having the judgment and ability to keep a child safe, but Father had not successfully participated in substance abuse programs and was continuing to test positive for methamphetamine and marijuana.

Thus, even though it might cause Josiah some level of emotional distress if the court terminated Father's parental rights, Ms. Wilson did not think that level of detriment would outweigh the benefits to him of adoption. Josiah was a young child at a critical stage in his life, and he would suffer some detriment if he spent the next 15 years in the foster care system, assuming parental rights were not severed. Ms. Wilson believed that adoption would provide Josiah with a beneficial sense of stability, belonging and permanence, which he needed. She recommended the court terminate all parental rights and order a permanent plan of adoption for Josiah.

10

In the CASA's report filed April 21, 2014, she stated that Josiah had adjusted well to Ms. G.'s home, but she understood Ms. G was unable to adopt him and that a permanent plan for adoption should be identified. Due to continued concerns regarding Father's sobriety, she recommended that his parental rights be terminated.

At the continued hearings on June 12 and 13, 2014, the juvenile court received in evidence, without objection, the Agency's May 5 assessment report and addendum, and the CASA report. The court also received as an exhibit the 124 pages of visitation logs. The court heard testimony from Father's own father, who stated that he was very attached to Josiah and so were others in his community. Father testified that Josiah started out calling him Mom or Dad, and sometimes still did so, because Father had played both roles for him as a baby. Father raised Josiah to be accepting of people that he would encounter on a daily basis, and Father believed that he deserved to have his dad in his life, and that the bond between them would never be broken.

Testimony was taken from Ms. Wilson, the social worker, who agreed that Father's visits throughout the dependency proceedings had been consistent and appropriate, and were now weekly. During the first six months of the dependency, Josiah had trouble separating from Father at the end of the visits. More recently, Josiah was still excited to greet Father but there were only a couple of times in the last five months that he had any difficulty or distress at the end of the visits. Although Josiah knew who his father is, and Father generally acted in a parental role toward him during visitation, there were still concerns that the benefits to Josiah of maintaining a relationship with Father

11

did not outweigh the potential long term benefits to him of adoption. Adoption was more likely to provide Josiah with permanency and stability and being part of a family.

In reaching its conclusions, the court read and considered the evidence contained in the Agency reports as well as the matters contained in the visitation logs. The court also considered the testimony of the witnesses and the arguments of counsel. The court first took note that Father had successfully maintained regular and consistent visitation, and no one was describing him as merely a friendly visitor. Father and Josiah had loving and positive interactions and acted in a familial way. However, within the visitation opportunities provided, which were always supervised in light of the remaining challenges in Father's life, the court was concerned that Father had failed to progress in terms of his case plan that was designed to address the issues that brought the matter before the court, such as providing for Josiah's safety. The court then found that there was not such a substantial emotional attachment to Father that would cause harm to Josiah if it were terminated.

The court discussed the seven visits that the social worker had observed, and gave her opinion considerable weight, that a permanent plan of adoption was appropriate. Even though there may be some temporary distress to Josiah if he is deprived of the relationship with Father, there was nothing in the record to support a finding that Josiah would be greatly harmed if the relationship were severed.

The court thus found by clear and convincing evidence Josiah was adoptable and would be adopted if parental rights were terminated. The court also found that none of the exceptions to adoption found in section 366.26, subdivision (c)(1)(B) applied and that

12

adoption was in Josiah's best interests. All parental rights to Josiah were terminated, and adoption was chosen as his permanent plan. A goodbye visit was allowed and this appeal followed.

## DISCUSSION

Father does not argue that Josiah is not likely to be adopted. Rather, he claims he carried his burden at trial of showing, by a preponderance of the evidence, that it would be detrimental to terminate his parental rights, because the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i) applies. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553-554.) On appeal, he claims there is no substantial evidence to support the court's rulings to the contrary.

### I

### *APPLICABLE STANDARDS*

When the court determines a dependent child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re C.F., supra*, 193 Cal.App.4th 549, 553; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) As relevant here, the adoption preference will not apply if termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

On review, the appellant bears the burden of demonstrating a lack of substantial evidence to support the trial court's findings and orders. (*In re L.Y.L.* (2002) 101

13

Cal.App.4th 942, 947.)  In reviewing the sufficiency of evidence, the reviewing court makes presumptions in favor of the order, views the evidence in the light most favorable to the Agency, and gives the order the benefit of every reasonable inference.  (*In re C.F., supra*, 193 Cal.App.4th 549, 553; *Autumn H., supra*, 27 Cal.App.4th 567, 576.)

There is some debate in recent case law on the proper approach in review of a decision about the beneficial parental relationship exception.  In *In re J.C.* (2014) 226 Cal.App.4th 503, the court applied the substantial evidence standard of review to the factual issues of whether the parent maintained regular visitation and contact with the child and whether the parent proved he or she had a beneficial parental relationship with the child.  However, as to the weighing test, in which the juvenile court balances the parent-child relationship against the benefits the child would derive from adoption, the abuse of discretion test applied to this " ' " 'quintessentially discretionary decision.' " ' " (*Id.* at p. 531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

Certainly, there is a discretionary component to the trial court's determination of a "benefit from continuing the relationship" under the terms of section 366.26, subdivision (c)(1)(B)(i).  Based on the respective showings, the court must balance "the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer."  (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)  "If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Ibid.*)  The court must find "a compelling reason for determining that

14

termination would be detrimental to the child," (§ 366.26, subd. (c)(1)(B)(i)), due to the parent's regular visitation and contact with the child, coupled with benefit to the child from continuing the relationship. (*In re C.F., supra*, 193 Cal.App.4th 549, 553-554.)

The weight of authority still applies the substantial evidence test to appeals from decisions about the beneficial parental relationship exception. (*Autumn H., supra*, 27 Cal.App.4th 567, 575-577.) In doing so, the appellate court does not redetermine the credibility of witnesses or reweigh the evidence presented. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 947.)

In any event, the discretionary determinations made by the trial court must be supported by the evidence, to avoid any conclusion on review that they were arbitrary, capricious, or patently absurd. (See *In re Stephanie M.* (1994) 7 Ca1.4th 295, 318-319.)

II

*APPLICABLE STANDARDS; VISITATION PRONG*

If the court determines a child is adoptable (as Josiah is), the parent bears the burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). (*In re S.B., supra* (2008) 164 Cal.App.4th 289, 297.) As described in *Autumn H.,* the beneficial relationship exception must be examined on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Autumn H., supra,* 27 Cal.App.4th. at pp. 575-576; *In re J.C., supra*, 226 Cal.App.4th 503, 532.)

Here, it is not disputed that Father "maintained regular visitation and contact with the child," to the best of his ability, within the meaning of section 366.26, subdivision (c)(1)(B)(i). The trial court acknowledged this factor was satisfied and we accept it here.

We accordingly evaluate the record under the standards for determining whether the trial court had a substantial basis to conclude that there would be no substantial, overriding benefit to Josiah in continuing a parental relationship with Father. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.)  "The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re J.C., supra*, 226 Cal.App.4th at pp. 528-529; see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347-1348.)

We thus inquire whether the evidence showed that even without day-to-day contact and interaction, this relationship was so "strong and beneficial" that "termination of parental rights would be detrimental to the child." (*In re C.F., supra*, 193 Cal.App.4th 549, 555, fn. 5.)  More than "some measure of benefit" must be conferred through the relationship with the parent.  (*Id.* at pp. 558-559.)  The parent must show he or she

16

occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

III

*ANALYSIS:  SUBSTANTIAL BENEFIT PRONG*

The issue here is not whether there was a bond between Father and Josiah.  The question is whether that relationship remained so significant and compelling in Josiah's life that the benefit of preserving it must outweigh the stability and benefit of adoption.  These proceedings addressed the issue of substantial or incidental benefit from this parent-child relationship in several ways.  First, Father argues his difficulty in complying with his case plan should not be dispositive, because he was able to keep visiting and to maintain a positive relationship with Josiah, who greeted him in a happy, affectionate way and called him Daddy.  The court gave some attention to Father's testimony that Josiah started out calling him Mom or Dad, and sometimes still did so, because Father had played both roles for him as a baby.  The record also showed that in general, Josiah was a friendly and outgoing child to social workers and the CASA, and to other relatives. "Many toddlers are cuddly, effusively loving, and affectionate." (*In re J.C., supra*, 226 Cal.App.4th 503, 533.)  As of a November 2013 status review report, Josiah's placement was going well, and he was receiving speech and individual therapy.  He continued to do well out of Father's custody.  The focus should be on whether Father was able to resume the role of a parent toward Josiah. (*Id.* at pp. 528-529.)

In the ruling, the court stated that Father's ongoing substance abuse problems, as shown by his treatment programs not completed and his positive drug tests, were

17

significantly related to his inability to obtain unsupervised visitation and to otherwise play a larger role in Josiah's life. Although Father's visitation was regular and of a familial nature, he was unable to make any substantial progress with his case plan that would have addressed the issues that gave rise to the need for the dependency proceeding, such as providing a safe home environment. He did not display behavioral changes that showed he had taken responsibility for the negative impacts of his lifestyle on a young child like Josiah, and he had not made significant progress in growing into the parental role. Even though the social worker consistently acknowledged that there was strength in the relationship between Father and Josiah, and Father's testimony and his own father's statements to the court raised the same issue, Father did not show there would be detriment from severing the relationship, in light of the showing about the problems to which Josiah would very likely be exposed in his care.

Next, Father points to evidence that Josiah had some difficulty in separating from him at the end of visits, and that Father sought to have reunification services reinstated when Josiah seemed to be having adjustment problems during visitation, at around the time he was moving to the home of the prospective foster mother (April 2014). After Father lost custody in February 2013, Josiah was moved between several foster homes until late May 2013, when he was placed in the home of Ms. G., where he benefited from speech and individual therapy, over about a year. The relevant question for the court was evaluating the quality of this particular parent-child relationship, given that Josiah had been out of Father's custody for that time period. " 'Interaction between [a] natural parent and child will always confer some incidental benefit to the child. . . . ' " (*In re C.F.,*

18

*supra*, 193 Cal.App.4th at p. 555.) The issue was whether Father occupied a parental role and it would be detrimental to Josiah if that role were terminated. (*Ibid.*)

Certainly, there are different explanations for why a child in foster care might have difficulties with parental visitation at different times, and Father cannot show that Josiah was having severe separation anxiety that was particularly related to Father, as opposed to arising from other stability-related problems. On a few visitation dates, long after reunification services had been terminated and shortly after the foster placement was made, Josiah seemed to be resisting getting in the car to visit Father, possibly because that would mean leaving the foster mother behind. The trial court had the responsibility of analyzing the evidence about all the circumstances in Josiah's life, and there is substantial evidence to support a conclusion that the problems Josiah was having with going to and from visitation were not attributable to the strength of his bond with Father.

Because Father continues to contend that the beneficial parental relationship exception should apply here, he further argues that the juvenile court erred or abused its discretion by choosing adoption as the permanent plan, over guardianship or long term foster care. Around the time the hearing was held, Father was pursuing a modification petition under section 388 and was trying to find other relatives with whom Josiah could be placed, but none of those efforts by Father or the Agency was successful. At the permanency stage, the bond the child shares with the parent and the harm that might arise from terminating parental rights must be balanced against what is to be gained in a permanent stable home, and "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In

19

*re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)  This parental benefit exception only exists where the parent has demonstrated there are such benefits to the child in continuing the parental relationship as will outweigh the benefits of permanence through adoption. This is not such an extraordinary case, such as where an older child has formed an enduring bond with a parent, despite the parent's shortcomings, and where it would be harmful to the child to interfere with that enduring bond.  (See, e.g., *In re Scott B.* (2010) 188 Cal.App.4th 452, 471.)

On this record, Father could not demonstrate any likelihood that he will be able to take custody of Josiah within any reasonable time, or that there are other alternative placements that would be preferable.  The trial court acknowledged that 15 years of foster care for then three-year-old Josiah did not constitute a predictable, stable plan that would effectively promote his well-being.  The court concluded that the potential benefits of adoption were not outweighed by any benefit from maintaining Father's presumed parent status.  (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424 [balancing test applies].) Substantial evidence supports this finding that the second prong of the beneficial parent-child relationship exception was not met.  For all of these reasons, the juvenile court did not err or abuse its discretion by ruling the parental benefit exception to adoption was not applicable here.  (§ 366.26, subd. (c)(1)(B)(i).)

DISPOSITION

The judgment is affirmed.

---------------------------------
                                    HUFFMAN, J.

WE CONCUR:

---------------------------------
        McCONNELL, P. J.

---------------------------------
        IRION, J.

21